Filed 10/23/23  P. v. Morales CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARLON MORALES,<br><br>    Defendant and Appellant. | B318146<br><br>Los Angeles County<br>Super. Ct. No. TA153061 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

Marlon Morales appeals his torture conviction and seeks resentencing.  He claims insufficient evidence supports his conviction and the trial court was unaware of its new discretion to dismiss sentencing enhancements.  We affirm.  Neither claim has merit.  Statutory references are to the Penal Code.

I

Morales's victim testified at trial.  She and Morales had dated on and off for more than a year.  Morales told her to come to his house early in the morning on November 7, 2020.  They were intimate and then fell asleep.

After a phone call woke him later that afternoon, Morales noticed notifications on the victim's phone and a call from a man.  Morales looked through the phone.  He beat her with his hands and other objects over the next 20 hours or so every time he saw something on the phone he did not like.

We provide more details of the victim's captivity later when reviewing the sufficiency of the evidence.  For now, we sketch some of Morales's acts over that 20-hour period and some of the victim's injuries.

According to the victim, Morales kicked and punched her, choked her, pulled her by her hair, and slammed her into a wall.  He hit her face with a gun and made her left eye bleed.  He hit her with a stick so hard the stick broke.  He hit her thigh with a brick after trying to hit her in the head with it.  He stabbed her thigh with scissors.  He kicked her in the back and fractured her vertebrae.  He made it seem as if he would set her on fire with gasoline using the gas can he had on hand.

The victim blacked out at one point and later pretended to lose consciousness so Morales would leave her alone.  She did not try to leave because she feared he would kill her.

Late in the morning of November 8, 2020, the victim's sister went to Morales's home. She banged on the door and windows, called out for her sister, and "did everything that [she] could to get [her] sister out . . . ." The victim did not say anything, for Morales threatened he would kill her and himself if she did. Morales had two guns on him. The victim eventually managed to text her sister to call the police when Morales left the room to get a rag to clean the blood off her face.

When police arrived, Morales refused to respond or to come out for almost a half hour. Eventually he came out with his hands up. The victim followed.

Video showed their exit from the home. In the video, Morales refers to the victim as his "girlfriend." A clinical social worker who saw the victim at a hospital shortly after the incident testified the victim similarly referred to Morales as her "significant other" and said he was the one who caused her injuries.

Police documented these injuries with photographs and video, which the jury saw. The victim's left eye was purple and swollen shut. Blood was dripping down her face from her eye. She had bruising and marks all over her body.

One of the responding officers testified at the July 2021 trial. Police had searched Morales's home and determined no one besides Morales and the victim was there. They found two loaded guns hidden in a couch cushion.

The jury heard from the victim's sister, her treating doctor, and a detective who interviewed the victim the day after the incident. The jury also heard the recorded interview. The victim described the ordeal similarly in this interview and at trial. The

doctor opined the victim's injuries appeared to be acute: generally speaking, they happened within the past 24 hours.

Morales testified in his defense. He admitted he had firearms at his house and he violated a criminal protective order by communicating with the victim from jail. He also admitted a prior domestic violence conviction. But he denied the bulk of the crimes here. He denied taking the victim's phone. He maintained he never hit or threatened the victim; rather, she had come to his home in her injured state and had refused his requests to go to the hospital. Morales said they were broken up at the time of the incident. He testified he was asleep when the victim's sister knocked on his windows and door, the noise did not wake him, and he had slept from Saturday morning after the victim came over until Sunday midday when the police arrived.

Morales called no other witnesses. He introduced a letter the victim sent him while he was in custody. Among other things, the letter professed her love for him and told him to stop letting his anger get the best of him.

The jury convicted Morales of torture, injuring a girlfriend, criminal threats, and two counts of possession of a firearm by a felon. It found true firearm, deadly weapon, and great bodily injury allegations. The jury found Morales not guilty of attempted murder.

On January 28, 2022, the trial court sentenced Morales to a term of seven years to life for the torture count, plus a consecutive ten years for the firearm enhancement. The court stayed a deadly weapon enhancement on this count. It imposed but then stayed an aggregate 11-year sentence for the domestic abuse count, which included multiple enhancements. It imposed concurrent terms of two years for each of the gun possession

counts and six years for the criminal threats count with a firearm enhancement.

Morales appealed.

## II

We affirm.

## A

Morales contends insufficient evidence supports his torture conviction, so the trial court should have granted his motion for acquittal and we should reverse his conviction. In particular, he urges there was insufficient evidence to support an inference he inflicted extreme pain *for purposes of revenge or persuasion*.

Morales's insufficiency challenge comes with a heavy burden he cannot meet.

In reviewing claims of insufficiency of evidence, we examine the whole record in the light most favorable to the prosecution. We discern whether there is substantial evidence from which any rational trier of fact could find the elements of the crime beyond a reasonable doubt. We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Morales notes the same standard applies when reviewing the sufficiency of evidence for purposes of acquittal motions. (*See id.* at p. 360, fn. 17.)

We focus on the challenged element of torture. (See § 206; *People v. Pre* (2004) 117 Cal.App.4th 413, 419 (*Pre*) [listing the elements].) Sufficient evidence shows *revenge* motivated Morales to hurt this victim. As Morales acknowledges, circumstantial evidence suffices. (*See id.* at p. 420.)

The trial showed the following.

5

In September 2019, more than a year before the incident, Morales became enraged when the victim refused to let him look through her phone. He slapped her. Then he drove her to an alley where he choked, kicked, and punched her. He "socked" her everywhere. The victim begged him to take her home, but Morales kept her in the alley for hours.

In October 2019, Morales again asked to see the victim's phone. She complied this time, and he went through her social media. Then he punched and choked her for about 20 minutes in front of his friends.

As for the incident, Morales had been upset because the victim planned to go to Detroit. He brought up "old stuff" about the victim "messing with his friends and stuff like that. So that kind of triggered him or whatever and got him mad." Morales and the victim argued. Then he told her to come over. When the victim got to Morales's home, he told her he loved her and wanted her "to be all his." He said, "you're going to stay in the house. . . . you're not going to go nowhere. You're going to be mine." They were intimate and fell asleep.

When Morales awoke later that afternoon, he noticed the victim had several notifications on her phone. He asked for the phone. The victim gave it to him even though she feared he would hit her. Morales went through her call log and saw she had received a call from jail. He slapped the victim in the face. Then he made a video call to a man named Manny who was the victim's family friend. Morales asked if Manny had been "messing around" with the victim. Manny denied it. Morales did not believe him and grew angry. He displayed the victim, who was naked, and taunted, " 'Oh, this is your girlfriend[.]' " Manny denied this and asked what was happening. Morales said not to

worry and hung up.  After Manny called back, Morales told him not to call anymore or this was going to go from bad to worse.

After the call, Morales grabbed his gun and hit the victim in the face with it multiple times.  He threatened to kill her.  At one point, he held the loaded gun to her throat.

Morales went back to looking through the victim's phone. He looked at her messages, contacts, and social media accounts throughout the day and night.  Whenever he saw something he did not like, he attacked the victim.  He ignored her pleas to stop.

Morales kept control of the victim's phone.  As he hit her, he would say, " 'Oh, you're out there being a ho' " and threaten to kill her.

Morales's attacks often targeted the victim's face.  He hit her multiple times in the face with his fist and with his gun; he kicked her in the face; later he threw a brick at her face.  The victim had a shoe print on the side of her face "consistent with . . . getting stepped on."

Morales also focused on the victim's genitals:  He tried to stab her with scissors and threatened to shove them in her vagina.

This evidence showed Morales acted for revenge.  A reasonable jury could conclude Morales wanted to make the victim pay for seeing and speaking with other men.

Morales concedes it is possible he acted out of revenge or a desire to persuade this victim "not to get with other guys" but argues a possibility is just speculation, not evidence.  The correct noun is inference, not speculation.  The inference was reasonable. (See *People v. Massie* (2006) 142 Cal.App.4th 365, 369 (*Massie*) ["If the trier of fact's conclusion reasonably and logically follows from the proof of the preliminary facts, an appellate court will not

interfere with the conclusion, even if the appellate court believes that a contrary conclusion would have been reasonable"].)

Morales argues the evidence simply shows he reacted out of anger, and "an emotional angry reaction is not torture." The evidence does show anger, but anger does not negate torture. (See *Massie*, *supra*, 142 Cal.App.4th at pp. 371–372 [evidence of anger does not preclude a torture conviction, and premeditation is not required].)

Morales maintains this case is distinguishable from cases the prosecution cites. When the evidence satisfied the elements, as it did, this argument is logically insufficient to establish the conviction was invalid. (See *Pre*, *supra*, 117 Cal.App.4th at p. 423 [comparing the facts in other torture cases is of little value in assessing the sufficiency of evidence of torture in a particular case].)

Sufficient evidence supported Morales's conviction.

B

Morales contends his case must be remanded for resentencing because there is no sign the trial court was aware of Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81) and the court's new discretion regarding enhancements. This contention is incorrect.

Senate Bill 81 fine-tuned how a trial court exercises its discretion to dismiss sentencing enhancements. (*People v. Walker* (2022) 86 Cal.App.5th 386, 395, review granted March 22, 2023, S278309.) It applies to sentencings after January 1, 2022, and therefore applied to Morales's sentencing. It adds a new subdivision to section 1385 that enables trial courts to strike enhancements in the interest of justice, and it provides a list of mitigating circumstances the courts must consider. (Stats. 2021,

ch. 721, § 1; *People v. Sek* (2022) 74 Cal.App.5th 657, 674.)  The amended statute specifies these circumstances weigh greatly in favor of dismissing an enhancement unless dismissal would endanger public safety.  (§ 1385, subd. (c)(2).)

Morales incorrectly argues no one alerted the court to this new law.  The defense sentencing memorandum performed this duty.  Under the heading "RELEVANT 2022 FELONY SENTENCING LAWS" the memorandum said:  "SB 81 amended 1385 which makes it clear that the Court can dismiss an enhancement if in furtherance of justice to do so.  The Court also has to give great weight to the evidence offered by the defendant to prove that specified mitigating factors are present.  Proof of the presence of one or more specified mitigating circumstances weigh greatly in favor of dismissing an enhancement."

The defense memorandum thus addressed Senate Bill 81 head on.  It also addressed various mitigating factors.

At the sentencing hearing, defense counsel again referred to the requirement of the "2022 laws" to consider mitigating factors.  The trial court announced it had read and considered the defense sentencing memorandum and letters supporting Morales, among other things.  The court then found Morales continued "to be a serious danger to society" and discussed the many aggravating circumstances present.

The trial court considered the new law.  Remand is unwarranted.

///

## DISPOSITION

We affirm the judgment.

WILEY, J.

We concur:

GRIMES, Acting P. J.

VIRAMONTES, J.